An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-670

Filed 20 May 2026

Randolph County, No. 20CR052605-750

STATE OF NORTH CAROLINA

v.

ARTURO CANSECO VALENZUELA, Defendant.

Appeal by defendant from judgment entered 16 May 2024 by Judge Thomas H. Lock in Randolph County Superior Court. Heard in the Court of Appeals 24 March 2026.

> *Attorney General Jeff Jackson, by Assistant Attorney General Ashton H. Roberts, for the State.*
>
> *Gilles Law, by Michelle Abbott, for defendant-appellant.*

DILLON, Chief Judge.

Defendant Arturo C. Valenzuela appeals after a jury found him guilty of taking indecent liberties with a child and statutory rape of a child under fifteen for encounters he had with his stepdaughter. Defendant raises several arguments concerning the prosecutor's closing argument, the exclusion of certain evidence, and

a clerical error by the trial court. For the reasoning below, we conclude Defendant received a fair trial, free from reversible error.

## I.    Background

The victim in this matter is Defendant's stepdaughter. Defendant married the victim's mother when the victim was three years old. Defendant, whom the victim called "dad," was "the only father [she] knew" while she was growing up. Eventually, Defendant and the victim's mother had three daughters together.

The State's evidence tended to show as follows: Defendant began inappropriately caressing the victim in the home while his wife was out and his daughters were pre-occupied. Over time, Defendant began touching the victim's genitalia over her clothing and would kiss her on her neck, cheeks, and mouth. The encounters continued to escalate and continued until the victim was "[a]round 14" years of age.

By the time the victim was a teenager, Defendant and the victim's mother had separated. However, on occasion, Defendant's daughters and the victim would stay over at Defendant's apartment. On certain occasions, at night after Defendant's daughters had gone to sleep, Defendant would enter the room where the victim was sleeping, remove her clothing, and attempt to penetrate her vagina with his tongue, fingers, and penis. This continued for several years, until the victim disclosed the abuse to her mother, resulting in Defendant's arrest in July 2020.

Defendant was tried for several crimes based on his abuse of the victim.

- 2 -

At trial, Defendant's counsel attempted to offer Defendant's medical records which indicated Defendant tested positive for herpes simplex virus types 1 and 2 in 2024, four years after the abuse stopped. After some discussion, the trial court preliminarily sustained the State's objection to the records, and after the conclusion of Defendant's direct and cross examination, the trial court decided to exclude the herpes test under Rule 403 of our Rules of Evidence because the "speculative and minimal" probative value of the test was "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or of misleading the jury."

After closing arguments, the jury returned a verdict of guilty of statutory rape of a child 15 years old or younger and of taking indecent liberties with a child. Defendant appeals.

## II. Analysis

Defendant raises several issues on appeal which we address in turn.

### A. Closing Arguments

Defendant raises several issues concerning the prosecutor's closing argument, contending certain statements were so egregious that they warrant a new trial.

Defendant failed to object at trial to any of the statements in the prosecution's closing of which he now complains in this appeal.

When a defendant fails to timely object, we review "alleged improper closing arguments" to see "whether the remarks were so grossly improper that the trial court committed reversible error by failing to intervene *ex mero motu*." *State v. Jones*, 355

N.C. 117, 133 (2002) (citation omitted). Practically, this is a two-fold inquiry where we determine "whether the argument was improper[,] and, if so, [ ] whether the argument was so grossly improper as to impede the defendant's right to a fair trial." *State v. Huey*, 370 N.C. 174, 179 (2017) (citations omitted). Relief is warranted when we discern "both an improper argument and prejudice[.]" *Id.* However, our Supreme Court has cautioned that:

> [o]ur standard of review dictates that only an extreme impropriety on the part of the prosecutor will compel this Court to hold that the trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument that defense counsel apparently did not believe was prejudicial when originally spoken. It is not enough that the prosecutors' remarks were undesirable or even universally condemned. For an appellate court to order a new trial, the relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process.

*State v. Goins*, 377 N.C. 475, 478 (2021) (quoting *Huey*, 370 N.C. at 180).

Our General Statutes place limitations on the arguments prosecutors may make during closing arguments. Specifically, "a[ ] [prosecutor] may not become abusive, inject his personal experiences, express his personal belief as to the truth or falsity of the evidence or as to the guilt or innocence of the defendant, or make arguments on the basis of matters outside of the record . . . ." N.C.G.S. § 15A-1230(a). These restrictions do not preclude a prosecutor from arguing "any position or conclusion with respect to a matter in issue[ ]" based on the "[prosecutor's] analysis of the evidence[.]" *Id.* Therefore, when prosecutors act "[w]ithin the[ ] statutory

confines, . . . prosecutors are given wide latitude in the scope of their argument and may argue to the jury the law, the facts in evidence, and all reasonable inferences drawn therefrom." *Huey*, 370 N.C. at 180 (citations and internal marks omitted).

Ultimately, "[i]n determining whether the prosecutor's argument was grossly improper, [this Court] must examine the argument in the context in which it was given and in light of the overall factual circumstances to which it refers." *State v. Ocasio*, 344 N.C. 568, 580 (1996) (citation omitted).

The parties organize Defendant's contentions regarding the prosecutor's closing argument into three categories, which we address in turn.

### 1. Arguments Based on Conjecture

Defendant contends certain portions of the prosecutor's closing argument were inappropriately based on conjecture rather than on evidence presented at trial.

While prosecutors are prohibited from "mak[ing] arguments [based on] matters outside of the record[,]" they may "argue any position or conclusion with respect to a matter in issue[ ]" based on their "analysis of the evidence[.]" N.C.G.S. § 15A-1230(a). To that end, "[p]rosecutors may . . . create a scenario of the crime committed as long as the record contains sufficient evidence from which the scenario is reasonably inferable." *State v. Frye*, 341 N.C. 470, 498 (1995) (citation omitted).

### a. Defendant's Plan

Defendant contends the prosecutor improperly asserted Defendant planned only to partially penetrate the victim to avoid rupturing the victim's hymen, because

if her hymen ruptured, the victim would panic and tell her mother. Thus, according to the prosecutor's closing argument, Defendant concocted this plan and carried it out in order to prolong and continue the abuse. We disagree with defendant's argument.

The following is the relevant portion of the prosecutor's closing statement:

> So[,] getting back to what I said was interesting about how [the victim] testified about that, he never fully put his penis all the way inside of her. Nope. [Defendant] put part of it inside of her. And I submit to you that that is because he knew if he put his penis all the way inside of her, it could mess up her hymen. It could cause bleeding. It could freak her out so much, the blood that she got from what happened, that she immediately tells her mother.
>
> [Defendant] doesn't want that to happen because he wants to keep doing what he's doing. He has a continuing course of conduct. This is an easy victim. She's not going to tell anything. Why? Because I [(referring to Defendant)] threaten her every single time, ["][D]on't you tell anyone.["] ["]You're not going to tell anyone.["] ["]Oh, no, I'm not going to tell anyone.["] ["]Even if someone hits you.["] ["]Oh, no, I'm not going to tell anyone.["]

We believe this argument was properly based on factual inferences from the evidence presented which tended to show Defendant attempted to conceal his abuse. For instance, when the abuse initially began, Defendant would call the victim into his bedroom while the victim's mother was at work, would caress the victim all over her body as she lay on Defendant's bed, and if and when the victim's younger sister would enter the room Defendant would pretend to tickle the victim instead. Then, around the time the victim was 14 years old and after Defendant and the victim's mother separated and Defendant moved to his own apartment, the sexual abuse began to

escalate to the point of penetration. When the victim's sisters were not around, Defendant would kiss the victim's cheek and neck, hug her from behind, attempt to kiss her mouth, and would "smack [her] butt" in a non-disciplinary manner. This abuse ultimately culminated in Defendant partially penetrating the victim with his tongue, fingers, and part of his penis. To avoid this sexual abuse, the victim would wear tight clothing to bed, but these clothes were to no avail as Defendant would overpower the victim, remove the tight clothing, and begin to attempt to penetrate the victim. The victim, however, would resist Defendant by pushing and kicking thereby preventing Defendant from fully penetrating the victim with his penis. And after each time Defendant would sexually abuse the victim, he would make the victim confirm that she would not tell others about the abuse.

Also, while engaging in the escalated forms of abuse, Defendant's actions permit the reasonable inference that he sought to avoid rupturing the victim's hymen—Defendant would physically overpower the victim to remove her clothes but would stop the abuse while she resisted him penetrating her. In other words, Defendant was capable of initially overpowering the victim to engage in the initial sexual abuse but would not then overpower her when he was partially penetrating the victim. Accordingly, it was reasonable for the prosecutor to infer Defendant's plan to conceal the abuse continued after the abuse escalated. Therefore, we conclude the prosecutor's inference that Defendant planned to partially penetrate the victim to conceal his sexual abuse is supported by fact and thus not improper.

b. Frequency of an Intact Hymen

Second, Defendant argues the prosecutor mischaracterized a portion of the expert testimony the State offered regarding the possibility of a hymen remaining intact following sexual abuse. We disagree.

That portion of the closing statement is as follows:

> Let's talk about that exam with Nurse Kintner, family nurse practitioner[,] who is trained to do these exams. I realize the hymen is a huge mystery to a lot of people. There's a lot of myths about it. Oh, well, any penetration and that thing is gone. You could ride a horse, that thing's gone. You can use a tampon. That thing's gone.
>
> Well, let's go back to he only used his finger, number one, and he only partially put his penis inside of her. And I submit to you, once again, that that is because he knew that he could possibly rupture her hymen.
>
> ["]Nurse Kintner,["] I asked[,] ["]is it unusual to have an intact hymen when there is actual sexual abuse[?"]
>
> ["]No, it's not unusual. It happens in a *large percentage of cases*.["]
>
> Don't let that fool you that this didn't happen.

(Emphasis added.)

In contrast, Nurse Kintner's testimony was not so sweeping:

> [The State]: Approximately how many of these physical exams have you performed?
>
> [Nurse Kintner]: To date, probably 400.
>
> [The State]: And are there other exams with findings like

- 8 -

[the victim's] with an intact hymen where you suspect sexual abuse?

[Nurse Kintner]:  There have been, yes.

[The State]:  And even penetration, is that correct?

[Nurse Kintner]:  That's correct.

The State concedes this portion of the closing departed from Nurse Kintner's testimony.  Despite this departure, we believe any impropriety was cured by the trial court's instruction to the jury prior to closing arguments.

In *State v. Campbell*, the defendant argued on appeal "that the prosecutor misstated portions of [an expert's] testimony[.]"  359 N.C. 644, 678 (2005).  The defense expert testified that while a defendant's actions are "important" and "critical" in the assessment of a defendant's state of mind, they alone are not determinative. *Id.* at 679.  However, in the prosecutor's closing argument, in an attempt to undermine the defense expert's testimony, the prosecutor stated the expert believed that there was no need to examine a defendant's actions.  *Id.* at 678.

Our Supreme Court concluded this portion of the closing argument "did not so infuse the proceeding with impropriety as to impede [the] defendant's right to a fair trial."  *Id.* at 679 (citation omitted).  The Court reasoned that any impropriety was cured by (1) the trial court's instruction to the jury that the jury must "rely solely upon [their] recollection of the evidence in [their] deliberations[,]" and (2) our presumption that jurors follow a trial court's instructions.  *Id.* (citing *State v. Gregory*,

340 N.C. 365, 408 (1995)).

Prior to the parties' closing argument, the trial court instructed the jury in a similar manner:

> Now, like the opening statements, the final arguments of the lawyers are not themselves evidence. . . .
>
> . . . .
>
> If in the course of making a final argument a lawyer attempts to re-state a portion of the evidence, and if your recollection of the evidence differs from that of the attorney, you are in recalling and remembering the evidence to be guided *exclusively* by your own recollection of the evidence.

(Emphasis added.)

Even if any impropriety exists, the argument was cured by the trial court's instruction to the jury to deliberate exclusively based on their own recollection of the evidence. Further, and because Defendant makes no argument to the contrary, we must presume the jury followed the trial court's instruction. Thus, the trial court did not err by failing to intervene *ex mero motu*.

c. Defendant's Use of the Bathroom

Third, Defendant argues the prosecutor impermissibly speculated that after sexually abusing the victim, Defendant "would go into the bathroom" "for a while" to "finish the job." We disagree.

As mentioned above, "[p]rosecutors may . . . create a scenario of the crime committed as long as the record contains sufficient evidence from which the scenario

is reasonably inferable." *Frye*, 341 N.C. at 498 (citation omitted).

When explaining our statutory rape statute and specifically how the statute does not require the emission of semen, the prosecutor argued:

> Remember [when] [the victim] said [Defendant] would go into the bathroom after [the sexual abuse]? I submit to you that that's [why] [Defendant] was going in the bathroom because he would be in there for a while.
>
> He'd get started with [the victim], get to the point where he needed to stop and not fully penetrate her, and he would go into the bathroom and finish the job.

The victim testified that after Defendant would attempt to penetrate the victim, Defendant would leave the victim and her sisters' bedroom to go into the bathroom before going back into his own room. Although the victim testified she did not hear what Defendant did while in the bathroom, she testified Defendant "was in there for a while." Also, at no point did the victim testify that Defendant ejaculated while sexually abusing her, but rather that Defendant would eventually leave after the victim began to resist the abuse. Considering these facts together, it could be reasonably inferred that, following the sexual abuse of the victim, Defendant masturbated in the bathroom. The reasonableness of this inference can be seen by the fact that Defendant's counsel came to a similar conclusion when attempting to undermine the State's investigatory steps during closing arguments:

> It could have been easy to get a search warrant to search [Defendant's] apartment to see if there was anything there.
>
> . . . .

> If a person had engaged in the sexual activity that's alleged here, it's likely, or I would contend that it's likely that if a search warrant was executed, you might be able to find some evidence of a person cleaning up after that sexual activity, trying to clean themselves off.
>
> [The victim's] testimony was that he would go to the bathroom after their encounters. *It's reasonable to assume there might have been a chance to find something there, but we'll never know because that wasn't done.*

(Emphasis added.)

Accordingly, we conclude the factual scenario the prosecutor argued was premised on reasonable inferences from the evidence. Thus, the trial court's failure to intervene *ex mero motu* was not error because this argument was not improper.

d. The Victim's Use of the Word "Vagina"

Finally, Defendant takes issue with the portion of the prosecutor's closing argument in which she sought to undercut potential causes of the victim's bacterial vaginosis. We disagree.

Defendant takes issue with the following:

> And, lastly, let's talk about the bacterial vaginosis. This kid [(referring to the victim)], she has to get up here and tell everyone that she had [bacterial vaginosis]. She has to get up here and tell you that she had to take medication for [her bacterial vaginosis]. She didn't know she had it. It's one of those things it can be transmitted sexually according to our expert witness and according to our expert witness who was completely candid with you all as well as everyone else in the courtroom, *you can get it in other ways.*
>
> So douching, perfume? *Does the girl who wasn't sure how to say* ["]*vagina*["] *in English strike you as the kind of girl*

*who is going to be using any kind of that stuff downtown?*
Question that very seriously.

Is it also a sign consistent with sexual abuse?  Absolutely.
The fact that she had it is unusual.  And remember she
never had a sexual relationship with anyone else, and if
she had, you can bet her dad [(referring to Defendant)]
would have told you about it.  So[,] for coming forward and
disclosing and telling her truth she had to go through
telling all of us about the first sexual experiences and the
horror that those experiences occurred with her stepfather
who she loved as her father.

(Emphases added.)

It appears that the prosecutor was attempting to credit Nurse Kintner's testimony by reminding the jury how Nurse Kintner provided unfavorable testimony to the State, but at the same time was undermining the impact of the unfavorable testimony (that bacterial vaginosis can be caused in non-sexual ways).  The State played for the jury a video of the victim's interview with a detective.  In this interview, the victim hesitated to say the word "vagina" when asked by the detective what the victim meant when the victim stated Defendant "would touch [her] down there[ ]" "[i]n the bottom area."  After those statements, the victim stated, "I don't really . . . I say it in Spanish; I don't really say it in English."  And before saying "vagina" in English, the detective asked if the victim knew the word in English.  The prosecutor's argument has basis in fact and is a reasonable inference from the interview played to the jury.  *See Huey*, 370 N.C. at 180 (citations and internal marks omitted).  Moreover, as distasteful as this argument was and even assuming it was improper, it did not

rise to the level needed to warrant intervention. *See Goins*, 377 N.C. at 478 ("[O]nly an extreme impropriety on the part of the prosecutor will compel this Court to hold that the trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument that defense counsel apparently did not believe was prejudicial when originally spoken." (citation omitted)).

Also, to the extent Defendant argues the impropriety of the prosecutor's comment that Defendant "would have told" the jury about the victim's other sexual partners if she had any, we note that a prosecutor "may properly bring to the jury's attention the failure of a defendant to produce exculpatory evidence or to contradict evidence presented by the State." *Campbell*, 359 N.C at 680 (citation omitted); *see also State v. Barden*, 356 N.C. 316, 359 (2002) ("The prosecution may argue that a defendant failed to produce a witness or other evidence to refute the State's case." (citations omitted)).

Thus, even assuming any impropriety, we conclude the trial court did not err by failing to intervene *ex mero motu*.

### 2. Message to the Jury

Next, Defendant argues the prosecutor improperly "impl[ied] that the jury had a responsibility to deliver justice to the victim and/or community and . . . direct[ed] [the jury] to 'send a message' to" Defendant. We disagree.

Towards the end of the closing, the prosecutor said the following:

> I ask you to consider all of the evidence. I am very

> appreciative of your time and your patience because I know it's a slog to come up here to the courtroom. You're not familiar with anything. I think eventually jurors get into a routine of going in and out and they understand. *But without people like you willing to serve, we could not get justice for victims, and you need to send a message to him.*

(Emphasis added.)

By stating the italicized portion above, we conclude the prosecutor did not stray into an improper argument. Viewed in context, *Ocasio*, 344 N.C. at 580, this portion of the prosecutor's argument is an attempt to thank the jurors for their service and, debatably, reflects the role of the jury in the judicial process. While our Supreme Court has upheld arguments where the prosecutor reminds or requests the jury "to act in their appropriate role as instruments of public justice[,]" *State v. Nicholson*, 355 N.C. 1, 44 (2002) (citations and internal marks omitted), we would not even go so far as to say the State did so here. But even assuming this statement amounts to something more than a "thank you," the argument is not improper as it generally reflects the jury's role in our justice system.

The portion of the statement in which the prosecutor directed the jury to "send a message to [Defendant,]" likewise was not improper. In *State v. Golphin*, 352 N.C. 364, 470–71 (2000), our Supreme Court concluded that "intervention by the trial court was not warranted" during the State's closing argument because it did not amount to a general deterrence argument. Part of this argument included the statement that "[s]omeone has got to tell people like these two defendants, 'We absolutely will not

tolerate this any longer.' " *Id.* at 470. Similarly, this Court in *State v. Shelton*, concluded it was permissible for the State to urge the jury to "send a message with [their] verdicts that this will not be tolerated. Let [the defendant] know that this will not be tolerated. That he'll be held accountable." 263 N.C. App. 681, 696 (2019). Therefore, the prosecutor's urging of the jury to "send a message to [Defendant]" was not improper. Even assuming the statements were inappropriate, we conclude they were not so inappropriate to require the trial court to intervene. Thus, the trial court did not err by failing to intervene *ex mero motu*.

### 3. Attacks on Defendant's Character/Credibility

Finally, regarding the State's closing, Defendant contends the prosecutor "made inflammatory remarks about [his] credibility and character."

### a. Criticism of Defendant's Body Language

With respect to the prosecutor's "attack" on Defendant's character and credibility, Defendant first argues the prosecutor impermissibly "inject[ed] her personal opinion that [D]efendant was lying because he looked down instead of looking at [the victim] while testifying." We disagree.

During closing arguments, the prosecutor attempted to undermine Defendant's credibility by reminding the jury of Defendant's body language while he was testifying:

> When he testified, I know you all were paying attention.
> You all watched him testify, and you saw him sitting at this
> witness stand and all he did was look down. He looked

down the whole time he was testifying. I even moved out of the way because what's in his direct line of sight but the woman he used to be married to and the little girl he abused. He couldn't even look at her while he denied every single thing he had done to her.

Why is that? If he didn't do that, look square on. ["]I didn't do it[,] [y]ou know I didn't do it.["]

Why is he looking down? You examine his testimony very carefully, and you examine, think about the extra details he gave on everything that were maybe just a little too much, trying to put himself in a good light, good dad. Maybe he was in some ways, but as far as [the victim] was concerned, [Defendant is] a monster.

Defendant contends this amounts to an implicit charge that Defendant is a liar and is thus grossly improper.

Defendant correctly notes that "[a] prosecutor is not permitted to insult a defendant or assert the defendant is a liar." *Huey*, 370 N.C. at 182 (citations omitted). That is why, in *Huey*, when there was *widespread* insinuation during the prosecutor's closing argument that the defendant was lying, our Supreme Court held that the State's use of thirteen variants of the word "lie" was improper (but not grossly improper). *Id.* at 181–82. But, on the other hand, our Supreme Court has stated a prosecutor may "argue to the jury that they should not believe a witness," *State v. Miller*, 271 N.C. 646, 659 (1967), and, more specifically, it has held that "remarks relat[ing] to the demeanor of [the] defendant" "are rooted in the evidence before the jury and are within the bounds of permissible argument[,]" *State v. Myers*, 299 N.C. 671, 680 (1980) (discerning no error in prosecutorial comments on the defendant's

demeanor while the defendant viewed images of the victim); *Nicholson*, 355 N.C. at 42–43 (the prosecutor's closing argument "did not cross the line into improper argument" after the prosecutor commented on the defendant's demeanor during trial).

Unlike in *Huey*, the prosecutor here did not engage in widespread insinuation that Defendant was a liar. Moreover, as in *Myers*, the prosecutor merely commented on Defendant's demeanor while he was testifying. Thus, the trial court was not required to intervene during this portion of the State's proper argument.

b. Calling Defendant a "[M]onster"

Defendant also takes issue with the prosecutor's characterization of Defendant as a "monster." When addressing Defendant's body language during his testimony and Defendant's self-bolstering, the prosecutor concluded that "as far as [the victim] was concerned, [Defendant is] a monster." Defendant claims this label, one which the victim did not give Defendant, was impermissible.

In support of this contention, Defendant cites *State v. Matthews*, in which our Supreme Court, in *dicta*, stated that the prosecutor improperly engaged in name-calling when the prosecutor characterized the defendant as a " 'monster,' 'demon,' 'devil,' 'a man without morals' and as having a 'monster mind.' " 358 N.C. 102, 111 (2004). Earlier in the opinion, however, our Supreme Court explained that because "[t]his case is remanded for other reasons, . . . it is not necessary for this Court to reach the issue of improper closing argument . . . . However, we feel compelled to

instruct the attorneys and courts . . . on how to conduct themselves in a proper and professional manner during closing argument." *Id.*; *see also id.* at 109 ("[The] [d]efendant's attorney committed ineffective assistance of counsel per se, and [the] defendant is entitled to a new trial."). Thus, the Court did not go on to hold the statements were grossly improper, or even improper. *See id.* at 112.

Even still, we do not believe the *single* reference to Defendant as a "monster" rises to the level of gross impropriety. In *State v. Hardy*, our Supreme Court held the trial court was not required to intervene *ex mero motu* after the prosecution characterized the defendant and his "hidden side" as a "monster." 353 N.C. 122, 137–38 (2000) ("While we do not condone referring to any defendant as a 'monster,' we decline to hold that the reference here rose to a level that required intervention by the trial court."); *see also State v. Reeves*, 337 N.C. 700, 733 (1994) (no reversible error when the trial court did not intervene after the prosecutor called the defendant a "predator"); *State v. Wilson*, 338 N.C. 244, 259–60 (1994) (likening of the defendant to Hitler was not grossly improper and did not warrant *ex mero motu* intervention); *State v. Cagle*, 266 N.C. App. 193, 204–06 (2019) (not grossly improper to repeatedly refer to the defendant or to his behavior during a police interview as "evil"). Accordingly, the prosecutor's characterization of Defendant as a "monster" was not so improper as to rise to the level of intervention.

c. Referring to Defendant's Testimony as "Ridiculous" and "a [L]oad"

Finally, Defendant argues the trial court erred by failing to intervene *ex mero*

*motu* when the prosecutor described certain parts of Defendant's testimony as "[r]idiculous" and "a load[.]" We again disagree.

The relevant portion of the prosecutor's closing argument is as follows:

> Every time she goes over there, he agrees with everything she says about the sleeping arrangements, the timing, everything. He disagrees with touching her in any improper way, but very interestingly he did testify about getting in bed with these girls.
>
> Ask yourselves if that's normal behavior when you have a 14-year-old in the bed. And look at the plausibility/believability of the reason he said he would get in bed with these girls. Oh, because they would ask him questions like why is it windy, why is the sky blue, I don't remember the exact questions, but they were along those lines. *Ridiculous. Ridiculous.*
>
> Sometimes they would ask him to read stories. Now, that sort of shifted. It was very interesting. When [Defendant's counsel] asked him, ["O]h, did you get in bed with the girls, why did you do that?["] Very, very long explanation. ["]I'm a good dad.["] ["]They would ask me questions.["] ["]I would want to read to them[."] But when I asked him about reading and whether the books were in English or Spanish, he kind of backed off of that real quick, real quick because *that's a load* and he wants you to believe it.
>
> He then backtracks and says, ["O]h, well, no, usually they would read their books by themselves,["] when before, ["O]h, I only get in bed with them because I'm a good dad and I'm going to read to them.["]

(Emphases added.)

Regarding the State's comment describing Defendant's explanation for why he was in bed with his daughters and the victim as "ridiculous," we believe that this

statement did not rise to the level of gross impropriety necessary to warrant *ex mero motu* intervention.

In *State v. Taylor*, our Supreme Court held that the prosecutor's description of the defendant's previous police interview statements as "absurd" was not grossly improper. 337 N.C. 597, 613–14 (1994). In that case, Defendant's vehicle was found in a wooded ravine approximately 150 feet from cul-de-sac wherein the victim's deceased body was found. *Id.* at 600. Despite telling police officers in his interview that he and another individual smoked crack-cocaine earlier, Defendant also told the officers that he later drove down into the ravine to use drugs there. *Id.* at 600–01, 613. To undermine the defendant's credibility, the prosecutor argued during closing arguments that the defendant's explanation that he moved his car down an unpaved road to use drugs was "absurd" given the fact that the defendant had already used the drugs. *Id.* at 614. Thus, our Supreme Court determined the statement was not grossly improper as it merely revealed that the defendant's statements lacked credibility and that the defendant failed to corroborate his statements. *Id.*; *see also State v. Hensley*, 277 N.C. App. 308, 313 (2021) ("[T]he prosecutor's categorization of [the] [d]efendant's testimony as a 'ridiculous excuse' was a small part of an otherwise proper argument that the jury should not believe [the] [d]efendant's claim[.]").

Likewise, the "ridiculous" comment was designed to demonstrate Defendant's testimony lacked credibility and did not provide a sufficient explanation of why he was in bed with the victim and his daughters. It was not grossly improper.

Similarly, the comment on the bedtime story explanation being "a load," was again an effort to demonstrate Defendant's testimony lacked credibility and that Defendant did not corroborate his version of events with sufficient testimony because he was unable to recall the simple detail of what language the books were in. Moreover, we are not persuaded by Defendant's reliance on the portion of *Matthews* that, in *dicta*, admonished counsel for the impropriety of making a scatological reference to the defendant's theory of the case. 358 N.C. at 111–12 (referring to the defendant's theory as "bull crap"). In *Matthews*, however, the scatological nature of the comment was far more apparent than the prosecutor's fleeting comment here. *See id.* at 111. Moreover, our Supreme Court has long held that "counsel must be allowed wide latitude in the argument of hotly contested cases." *State v. Monk*, 286 N.C. 509, 515 (1975) (citations omitted). Therefore, these comments were either not improper or did not rise to the level necessary for trial court intervention.

## B. Excluded Evidence

Next Defendant argues the trial court erred in excluding certain evidence. Specifically, Defendant argues the trial court improperly excluded evidence of his positive herpes test under Rule 403 of our Rules of Evidence. We disagree.

Defendant sought to introduce evidence of his positive herpes test to undercut the State's theory that Defendant engaged in sexual conduct with the victim because there was testimony that the victim tested negative for herpes. After a preliminary ruling on the issue before Defendant began to testify on the second day of trial, the

trial court later ruled it would exclude the evidence because the probative value was "speculative and minimal" and was substantially outweighed by the dangers of "unfair prejudice, confusion of the issues, or of misleading the jury."

Generally, relevant evidence is admissible. N.C.G.S. § 8C-1, Rule 402. Relevant evidence may be excluded, however, "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." *Id.* § 8C-1, Rule 403; *see also State v. Lail*, 388 N.C. 431, 433 (2025). In other words, acknowledging that the evidence might have some probative value, Rule 403 is used to exclude evidence if certain dangers substantially outweigh the probative value of that evidence. Our Supreme Court has explained

> [e]vidence has "probative value" if it tends to prove or disprove a point in issue. As a result, the extent to which evidence does or does not have probative value depends upon the extent to which a reasonable mind would be more or less influenced by the introduction of the evidence in question in determining whether a disputed fact did or did not exist.

*State v. Young*, 368 N.C. 188, 212 (2015) (cleaned up).

We review a trial court's decision to exclude evidence under Rule 403 pursuant to an abuse of discretion standard. *State v. Hennis*, 323 N.C. 279, 285 (1988); *see also State v. McKoy*, 385 N.C. 88, 97 (2023). A trial court "may be reversed for abuse of discretion only upon a showing that the ruling was so arbitrary that it could not have been the result of a reasoned decision." *State v. Lloyd*, 354 N.C. 76, 108 (2001)

(citation and internal marks omitted); *see also Lail*, 388 N.C. at 433 (briefly outlining the occasions where a trial court abuses its discretion).

The trial court's ruling to exclude Defendant's evidence was a reasoned decision. It concluded the herpes test had a low probative value because: (1) no testimony was offered regarding whether the herpes strands were transmissible through non-sexual contact; (2) there was a lack of medical testimony about the ease of transmissibility; (3) a period of four years passed between Defendant's positive test result and his last alleged sexual contact with the victim; and (4) since his separation with the victim's mother, Defendant had other sexual partners apart from the victim. Thus, according to the trial court, the tests would have very little, if any, influence on a reasonable juror in the determination of whether the sexual abuse actually occurred. *See Young*, 368 N.C. at 212.

Crucial to the trial court's reasoning is the lack of evidence explaining how herpes can be transmitted and the overall timing of Defendant's positive test. If it was the case that herpes could only be transmitted via sexual contact, Defendant's positive test would have been probative of the fact that the sexual abuse did not occur in light of the victim's negative test, because Defendant was incarcerated from the last alleged sexual contact until he was tested and maintained that he was abstinent the entire time he was incarcerated. Stated differently, if herpes is transmissible only by sexual contact, Defendant's last sexual contact was with the victim and, therefore, he could not have contracted herpes after the last sexual contact with the

victim because he did not engage in sexual activity while incarcerated.

However, if herpes can be transmitted via non-sexual contact, Defendant could have contracted herpes by non-sexual means during the four years he was incarcerated despite his abstinence. Had the trial court admitted Defendant's positive test based on the evidence before it, the admission would have ignored the possibility Defendant could have contracted herpes non-sexually. Thus, would have unfairly prejudiced the State, confused the issues, or misled the jury, because Defendant's theory would have been medically inaccurate. Recognizing the importance of testimony about how herpes can be transmitted as to both the probative value of Defendant's evidence as well as the prejudice to the State, the trial court properly excluded the evidence of Defendant's positive test pursuant to Rule 403. The trial court's decision is reinforced by the existence of testimony revealing the lapse of four years from Defendant's last sexual contact with the victim and his positive test as well as Defendant's testimony he had other sexual partners following his separation with the victim's mother.

Despite this, however, Defendant makes several arguments about the trial court's reasoning.

First, Defendant takes issue with the trial court's finding about the lack of testimony regarding non-sexual transmissibility, but again, this is the crux of the issue of whether the evidence should have been admitted despite it having *some* probative value. The admission of Defendant's positive test would have been unfairly

prejudicial to the State or, in the alternative, confusing to the issues or misleading to the jury if the trial court permitted Defendant to utilize medically inaccurate beliefs about herpes.

Second, Defendant contends the trial court's reasoning stating there was a "lack of any medical testimony as to the ease of transmissibility" is belied by the record because Nurse Kintner testified on cross-examination that multiple sexual encounters with a herpes-positive person could increase an individual's chances of contracting herpes. Being that findings of fact must be supported by the evidence, *see generally State v. Carter*, 282 N.C. 297, 303 (1972) (determining the trial court's findings were supported by the evidence offered during *voir dire*), even if we were to set this finding aside as "unsupported," we believe the remaining findings support the trial court's conclusion to exclude the evidence under Rule 403.

Third, Defendant attempts to deflate the trial court's concern with the time period elapsed between the last alleged sexual assault and the test. Once again, the test would not be very influential in a reasonable mind as it attempts to determine whether the sexual assaults occurred considering that Defendant could have been exposed at any point during those four years. *See Young*, 368 N.C. at 212.

Fourth, Defendant argues the trial court should not have considered Defendant's other sexual partners in its Rule 403 analysis because that fact was "irrelevant." However, it is undisputed that Defendant conceded he had more than one sexual partner following his divorce with the victim's mother during the State's

cross-examination. Also, to the extent that the trial court's preliminary ruling prevented Defendant from establishing his sexual partner timeline, we note the State elicited the testimony about Defendant's sexual partners *after* the preliminary ruling and the trial court gave Defendant's counsel an opportunity for redirect examination; counsel could have examined the issue while still complying with the preliminary ruling.

Ultimately, however, while not denying that the test had *some* probative value—specifically that the test minimally and speculatively assisted in proving the sexual assaults did not occur—the trial court ruled the low probative value was overshadowed by the dangers posed by the evidence. Allowing the jury to rely on a potential misconception about the transmissibility of herpes would do exactly what the trial court concluded: the State would have been unfairly prejudiced, the issues would have been confused, or the jury would have been misled. The fact still remains that Defendant was tested *four years* after the last alleged sexual assault occurred and, at trial, failed to rule out the possibility that he could have contracted herpes by non-sexual contact. By failing to rule out such a possibility, it is conceivable that Defendant could have been exposed to and then contracted herpes at any point during that four-year period. This evidence would have been far more probative *if* there was corroborative evidence demonstrating herpes can only be transmitted via sexual contact (beyond the negligible amount of testimony given by Nurse Kintner where she generally states that repeated sexual encounters with an infected person would

increase the other individual's chances of contracting herpes).

Thus, when properly framed in this light, we agree with the trial court that the probative value of the test is "speculative and minimal" and substantially outweighed by the Rule 403 dangers. Accordingly, the trial court did not abuse its discretion and, thus, did not err when it excluded Defendant's positive herpes test under Rule 403.

## C. Cumulative Error

Defendant also argues the "combined effect" of the prosecutor's closing argument and the excluded herpes test constituted cumulative error depriving Defendant of his right to a fair trial. It is true our Supreme Court has looked at the combined effect of multiple trial court errors and analyzed those errors to see whether, "taken as a whole, [the errors] deprive[ ] [a] defendant of his due process right to a fair trial free from prejudicial error." *State v. Canady*, 355 N.C. 242, 254 (2002). In light of our resolution of the issues above, there can be no cumulative error as the trial court did not err.

## D. Clerical Error

Turning to Defendant's final argument on appeal, he contends the trial court committed a clerical error when entering the judgment form. Specifically, Defendant argues the judgment for his statutory rape conviction improperly lists the offense date as 1 January 2017 because the victim testified she was 14 years old at the time Defendant penetrated her. According to Defendant, this clerical error requires us to remand for correction. We disagree.

"[A]n error on a judgment form which does not affect the sentence imposed is a clerical error, warranting remand for correction but not requiring resentencing." *State v. Gillespie*, 240 N.C. App. 238, 245 (2015) (citation omitted). In other words, clerical errors are those "resulting from a minor mistake or inadvertence . . . and not from judicial reasoning or determination." *State v. Taylor*, 156 N.C. App. 172, 177 (2003) (citation and internal marks omitted). We review clerical errors de novo. *State v. Hauser*, 271 N.C. App. 496, 503 (2020).

Defendant is correct that *if* a clerical error exists, we must remand for its correction. However, we do not believe the judgment form contains a clerical error. To be sure, during the victim's testimony, the victim at times testified she was 14 years old when the penetration began, which would not have occurred until her birthday in August 2017. If that was the only evidence available, then the trial court committed a clerical error because the penetration could not have occurred until, at the very least, 8 months after January 2017 on the victim's birthday. But the victim also testified that she was "around 14" at the time of Defendant's penetration which means she was not yet 14 years old when Defendant's sexual abuse began to include the penetration. Moreover, the victim testified that the penetration did not occur until Defendant moved to a two-bedroom apartment, which Defendant said occurred in 2016 or 2017. This testimony reveals the offense may have occurred before the victim turned 14 years old and, therefore, there was no clerical error.

Our review of the applicable case law reveals a dearth of published authority. However, we find *State v. Stephens*, 290 N.C. App. 554, 2023 WL 6119707, *2 (2023) (unpublished) persuasive. There we concluded the trial court did not commit a clerical error. *Id.* The verdict did not contain nor was it required to contain a specific date for the date of offense and the dates listed in the judgment fell within the range listed on the indictment. *Id.* Similarly, here, the verdict did not contain an offense date (nor was it required to) and the offense date listed on the judgment form fell within the range listed in the indictment. Thus, there was no clerical error.

## III.    Conclusion

Defendant received a fair trial, free from reversible error.

NO ERROR.

Judges WOOD and GRIFFIN concur.

Report per Rule 30(e).